**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DANIEL LESLIE, individually and on behalf of all similarly situated individuals, | |
| *Plaintiff,* | Case No. |
| v. | |
| MEDLINE INDUSTRIES, INC., STERIS ISOMEDIX OPERATIONS, INC., COSMED GROUP, INC., and VANTAGE SPECIALTY CHEMICALS, INC., | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Daniel Leslie brings this Class Action Complaint and Demand for Jury Trial against Defendants Medline Industries, Inc. ("Medline"), Steris Isomedix Operations, Inc. ("Steris"), Cosmed Group, Inc. ("Cosmed"), and Vantage Specialty Chemicals, Inc. ("Vantage"), together ("Defendants"), for the increased risk of cancer they have caused to individuals living and working in the vicinity of their medical sterilization facilities as a result of toxic ethylene oxide emissions into the community. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief as to all other matters.

## INTRODUCTION

1. Defendants Medline, Steris, Cosmed, and Vantage are industrial users and polluters of ethylene oxide gas in Illinois. Medline, Steris, and Cosmed are industrial medical sterilizers, and Vantage is a chemical producer.

2. While ethylene oxide ("EtO") has been classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since

at least the mid-1980s, Medline, Steris, Cosmed, and Vantage disregarded ethylene oxide's harmful properties and continued to release it into the surrounding communities—entirely unbeknownst to area residents and workers.

3.      Self-reported emission estimates from these facilities indicate high levels of ethylene oxide release. The combined ethylene oxide emissions from these facilities have reached as high as 13,000 pounds per year. While some EtO emissions are from controlled sources, the majority of these emission estimates are "fugitive emissions" that have been escaping, and continue to escape, the facility.

4.      Initial air monitoring tests commissioned by the Lake County Health Department, the Village of Gurnee, and the City of Waukegan demonstrate the widespread nature of Defendants' ethylene oxide pollution. The tests show the presence of toxic ethylene oxide gas as far as 4.5 miles from the Medline facility and 4 miles from the Vantage facility—significantly further than previously suspected.

5.      As a result, individuals living and working near these EtO-emitting facilities face some of the highest long-term cancer risks in the United States. These individuals have been inhaling ethylene oxide on a routine and continuous basis for decades. Now they are suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects from continuous exposure to ethylene oxide.

**THE PARTIES**

6.      Plaintiff Daniel Leslie is a natural person and a citizen of the State of Illinois.

7.      Defendant Vantage Specialty Chemicals, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business located at 4650 South Racine Avenue, Chicago, Illinois 60609.

8.     Defendant Medline Industries, Inc. is a corporation organized and existing under the laws of Illinois with its principal place of business located at 3 Lakes Drive, Northfield, Illinois 60093.

9.     Defendant Steris Isomedix Operations, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business located at 5960 Heisley Road, Mentor, Ohio 44060.

10.    Defendant Cosmed Group, Inc. is a corporation organized and existing under the laws of Maryland with its principal place of business located at 28 Narragansett Avenue, Jamestown, Rhode Island 02835.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

12.    This Court has personal jurisdiction over Defendants because they operate or previously operated industrial facilities in this District, currently conduct or previously conducted business throughout this District, and committed tortious acts within this District that are the subject of this suit.

13.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims of Plaintiff and the Class occurred in this District.

## COMMON FACTUAL ALLEGATIONS

I.   **Brief Overview of the Ethylene Oxide Industry**

14.     Ethylene oxide is a flammable gas at room temperature that is produced in large volumes for industrial use. There are two primary known industrial uses for ethylene oxide: medical equipment sterilization and chemical production.

15.     Commercial medical equipment sterilizers use the ethylene oxide sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate.

16.     For chemical production, producers cause EtO to undergo a chemical reaction to create new chemical compounds. Ethylene glycol is one of the most common chemicals synthesized from ethylene oxide and is often used in a wide range of products such as polyester fibers (for use in clothing, carpets, and upholstery), industrial coolants, antifreeze, and personal care products such as cosmetics, shampoos, body washes, and other skincare products.

17.     Defendants Medline, Steris, Cosmed, and Vantage use and/or have used ethylene oxide in their industrial processes. Between approximately 1994 and 2005, Cosmed operated a medical sterilization facility located at 1160 South Northpoint Boulevard in Waukegan, Illinois ("the Waukegan Facility") until Steris took over the facility in 2005. Steris operated the Waukegan Facility, and continued to use EtO for industrial medical device sterilization, from January 2005 until 2008, when Medline ultimately took over the facility. Since 2008, Medline has used and continues to use EtO for medical device sterilization at the Waukegan Facility. Vantage and its

predecessors have used, and continue to use, EtO in chemical production at their facility in Gurnee, Illinois (the "Gurnee Facility") since approximately 1985.

18.     Through their industrial processes, these plants emitted (and Medline and Vantage continue to emit) EtO into the air, allowing it to disburse and be carried by wind throughout the area surrounding the facilities. Indeed, Lake County recently conducted EtO air monitoring tests, discussed below, demonstrating that EtO emissions have traveled as far as 4.5 miles from the Waukegan Facility and 4 miles from the Gurnee Facility.

19.     As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades all while Medline, Steris, Cosmed, and Vantage knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

## II.     Health Effects of Ethylene Oxide Exposure

20.     Ethylene oxide—a colorless and odorless gas—is dangerous, toxic, carcinogenic, and mutagenic. It is also highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

21.     In a 1977 report, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised a concern about the potential carcinogenicity of ethylene oxide.

22.     In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the

studies showed an increase in the incidence of leukemia in line with the increase of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased risk of leukemia and other cancers.

23.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

24.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

25.      In 1994, as a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen—the agency's highest risk classification—finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its EtO classification to "known to be a human carcinogen." In 2016, the U.S. Environmental Protection Agency's ("U.S. EPA") Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO thirty-fold.

26.     Exposure to ethylene oxide has been widely studied and its negative health effects well documented. Presently, there is evidence linking ethylene oxide exposure to an increased risk of lymphohematopoietic cancers such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, the uterus, and the brain; and reproductive and developmental impairments including an increased rate of miscarriages and infertility.

6

27.    Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding Sterigenics—a commercial sterilizer—whose facility in Willowbrook, Illinois, has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirm the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;

- Pediatric lymphoma;

- Breast cancer;

- Prostate cancer;

- Pancreatic cancer;

- Ovarian cancer; and

- Bladder cancer.

28.    Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The EPA states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

III.    **Lake County Facilities Emit Harmful Ethylene Oxide**

a.    **The U.S. EPA Estimates High Risks of Cancer in Lake County**

29.    On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA")—a screening tool that estimates cancer risks based on emission data in 76,727 census tracts across the United States.

30.    The 2014 NATA revealed 109 census tracts in the United States with cancer risk scores greater than what the U.S. EPA considers "acceptable": 100 cancer cases per one million people exposed to toxic air pollution during their lifetime. Of those 109 census tracts, four tracts

directly surround Defendants' two facilities in Lake County. Additionally, six other census tracts in the area showed more than double the national toxic air cancer risk of thirty cases per million:

- Tract 17097862605: **157 per million**

- Tract 17097862800: **131 per million**

- Tract 17097861504: **123 per million**

- Tract 17097862604: **100 per million**

- Tract 17097863201: 87 per million

- Tract 17097862502: 76 per million

- Tract 17097862603: 70 per million

- Tract 17097862902: 68 per million

- Tract 17097862501: 66 per million

- Tract 17097863100: 62 per million

31.     The U.S. EPA released a statement that it believes that the "largest sources of ethylene oxide emissions in Lake County are Medline, a commercial sterilizer located in Waukegan, and Vantage, a chemical production facility in Gurnee."

32.     The U.S. EPA estimates the lifetime risk of developing cancer due to air toxicity in one of these four tracts near the Medline and Vantage facilities to be up to five times higher than the average national cancer risk across the U.S. population. Fewer than one percent of the census tracts in the United States have an estimated cancer risk due to air toxicity that measures up to the cancer risk in these four tracts.

**b.     The U.S. EPA's Cancer Risks are Understated**

33.     While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Waukegan Facility and Gurnee Facility, these risks are actually *understated*.

8

34. The U.S. EPA itself warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate emission sources and potential public health risks. It notes several NATA shortcomings, such as the lack of direct measurement of pollutants and data gaps.

35. In fact, such a data gap presented in the 2014 assessment as to the Gurnee Facility—Vantage's 2014 EtO emissions in Gurnee, Illinois, were actually *omitted* from the 2014 NATA. According to the U.S. EPA, this was due to a clerical "error" in the National Emissions Inventory which caused Vantage's 2014 EtO emissions to be calculated as zero.[1]

36. Without the Vantage emissions in its calculations, the cancer risks identified in the 2014 NATA for people living and working in the Gurnee area were, and continue to be, dramatically underestimated.

37. Accordingly, the lifetime risk of developing cancer in the aforementioned census tracts is likely significantly higher than what the U.S. EPA estimated in the 2014 NATA.

38. Finally, and most importantly, the 2014 NATA is *only* a model created on an *assumed* exposure to a facility's reported 2014 emissions. But the emissions from the Waukegan Facility and the Gurnee Facility have historically been higher than their reported emissions in 2014, making any assumption as to exposure statistically underrated.

39. In addition to the NATA, the U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals which pose a threat to human health and the environment.

---

[1] *Ethylene Oxide Emissions in Lake County, Illinois* | EPA in Illinois | US EPA, https://www.epa.gov/il/ethylene-oxide-emissions-lake-county-illinois#vantage (last visited March 6, 2020).

40.     A review of TRI data from the U.S. EPA shows EtO emissions from the Gurnee Facility over the past three plus decades, with a prominent increase of emissions beginning in 2010. *See* Figure 1.



(**Figure 1.**)

41.     While Vantage and its predecessors reported 2,723 pounds of EtO emissions in 2014 from the Gurnee Facility, that figure is overshadowed by its nearly 20,000 pounds of EtO emissions during a two-year period in 2010 and 2011. Similarly, Vantage reports emitting EtO in significant, albeit smaller, quantities throughout the years:

- 2010: 9,649 pounds
- 2011: 9,709 pounds
- 2012: 3,425 pounds
- 2013: 2,832 pounds

- 2014: 2,723 pounds
- 2015: 1,277 pounds
- 2016: 1,127 pounds
- 2017: 1,547 pounds

42.     It is important to note that the majority of reported total emissions from the Gurnee Facility, as shown above, include fugitive sources such as leaking valves and other equipment, which can only be estimated due to their elusive nature. To illustrate, fugitive emissions from the Gurnee Facility constituted more than 80% of its total emissions in 2010 and 2011: in 2010, Vantage reported 9,649 pounds of total EtO emissions, including 8,073 pounds of fugitive emissions, and in 2011, Vantage reported 9,709 pounds of total EtO emissions, including 7,984

pounds of fugitive emissions. Vantage's fugitive EtO emissions thus constitute a significant portion of its total emissions:

- 2010: 8,073 pounds
- 2011: 7,984 pounds
- 2012: 2,704 pounds
- 2013: 2,110 pounds

- 2014: 2,003 pounds
- 2015: 551 pounds
- 2016: 414 pounds
- 2017: 810 pounds

43.     Although Vantage reported reductions in emissions at its Gurnee Facility starting in 2012, the facility's self-reported regulatory data is difficult to independently verify. For example, in 2014, Vantage alternatively reported to the U.S. EPA that it had released *6,412 pounds* of EtO—**a figure drastically different from the 2,723 pounds that were reported in the U.S. EPA's TRI**.

44.     Regrettably, this alternative emissions data was not used in calculating cancer risks in the 2014 NATA referenced above, undoubtedly leading to gross misestimation of the *actual* cancer risk for individuals exposed to Vantage's toxic emissions.

45.     As for Medline and its predecessors, the U.S. EPA's TRI data, ranging from 1994 to 2005, shows that emissions from the Waukegan Facility consistently exceeded 4,000 pounds of EtO between 1996 and 2001, including approximately *17,000 pounds* between 1999 and 2001. *See* Figure 2.



**(Figure 2.)**

46.     Although the TRI data does not display any emissions from the Waukegan Facility after 2005, according to self-reported emissions data submitted to the Illinois Environmental Protection Agency ("IEPA"), the Waukegan Facility continued to emit significant amounts of EtO over the years:

- 2006: 5,484 pounds
- 2007: 4,980 pounds
- 2008: 3,297 pounds
- 2009: 3,784 pounds
- 2010: 3,750 pounds
- 2011: 3,437 pounds
- 2012: 3,512 pounds
- 2013: 3,069 pounds
- 2014: 3,526 pounds
- 2015: 3,115 pounds
- 2016: 2,993 pounds
- 2017: 2,863 pounds

47.     Notably, these self-reported emissions to the IEPA from the Waukegan Facility are *only* controlled emissions and do not include any estimates for fugitive emissions—which, as demonstrated, typically constitute a significant portion of overall emissions.

48.     While Medline, Steris, Cosmed, and Vantage have been knowingly and continuously releasing EtO for decades, people living and working in the surrounding community were unaware that the Defendants routinely and continuously exposed them to a dangerous, toxic, carcinogenic, and mutagenic gas.

**c.     Lake County Begins Air Monitoring**

49.     On August 21, 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released a report of health risks related to the chemical release of EtO by Sterigenics, a commercial sterilizer in Willowbrook, Illinois. The ATSDR concluded that an elevated cancer risk existed for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility due to EtO.

50.     In the following months, Lake County officials, health departments, state and nationally elected representatives, and concerned residents repeatedly pleaded with the U.S. EPA

and IEPA to conduct ambient air monitoring surrounding the Medline and Vantage facilities. Despite these requests, the U.S. EPA and IEPA refused to conduct ambient air monitoring anywhere in Lake County, much less near the Medline and Vantage facilities.

51.     Finally, on May 20, 2019, local community officials approved an intergovernmental agreement between the Village of Gurnee, City of Waukegan and Lake County to conduct air monitoring.

52.     The air monitoring began on June 3, 2019, with placing cannisters at four sites near the Waukegan Facility, four sites near the Gurnee Facility, and two remote locations in Lake County. The Lake County Health Department released partial test results on June 21, 2019, that revealed the presence of EtO in almost every sample. The test results also showed the presence of EtO as far as 4.5 miles from the Waukegan Facility and 4 miles from the Gurnee Facility.

53.     Specifically, the air monitoring cannisters surrounding both facilities registered elevated levels of EtO, with the highest twenty-four hour reading at ten micrograms of ethylene oxide per cubic meter of air (10 ug/m$^3$). For reference, the U.S. EPA associates a concentration of ethylene oxide of 0.02 ug/m$^3$ with a 100-in-a-million cancer risk for a lifetime of continuous exposure. Accordingly, the highest recorded EtO concentration surrounding the Medline and Vantage facilities corresponds with a cancer risk as high as *500 times* the EPA's 100-in-a-million cancer risk.

54.     On November 26, 2019, the Lake County Health Department received the first set of air monitoring test results from the second phase of air testing that took place between October 26, 2019 and November 2, 2019.

55.     Those air test results confirmed the June 2019 findings. That is, ethylene oxide has been detected in high concentrations in communities around the Waukegan Facility and the Gurnee Facility, and in remote locations away from both facilities.

56. The full extent of EtO emissions throughout Lake County was unknown to those living and working in the area until Lake County released the air monitoring test results. Indeed, the local air monitoring tests revealed a more accurate picture of EtO concentrations and the distance EtO has traveled than the U.S. EPA's NATA report. And the air monitoring tests revealed areas in Lake County with high EtO concentrations that were previously not indicated by the 2014 NATA report.

57. Lake County has concluded follow up air monitoring in early 2020 and intends on releasing the results shortly.

58. Nonetheless, the full health impact on those who live and work near the Medline and Vantage facilities is still not entirely known. The Lake County Health Department has requested that the IDPH conduct a cancer incidence assessment in Lake County, but no public report has been issued.

IV. **Plaintiff and Class Members Have Suffered Harm and Require Ongoing Diagnostic Testing**

59. Ethylene oxide is known to cause serious illnesses including, without limitation, blood cancers and breast cancers. As a result, through Defendant's release of ethylene oxide, Plaintiff and members of the Class have a significantly increased risk of contracting one or more of these illnesses as described above.

60. Indeed, Plaintiff and Class Members have endured exposure to EtO at levels significantly more hazardous than the general public and as a result are at a significantly greater risk of developing cancer as compared with the general population.

61. Plaintiff and the Class have been exposed to EtO at levels that make it reasonably necessary for them to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of their exposure. Monitoring procedures exist in the

14

contemporary medical field that make possible the early detection of cancer, the disease progression of cancer, and the presence of biomarker abnormalities that indicate that development of cancer.

62.     These diagnostic tests for the early detection of signs or symptoms of cancer are medically necessary to assure early diagnosis and effective treatment and to mitigate the risks of onset disease.

63.     Accordingly, Plaintiff and Class Members seek as damages the costs of such diagnostic testing and medical monitoring, in order to detect the early onset of disease. This testing will, in turn, identify the need for treatment, management, and rehabilitation in the event cancer is detected and Plaintiff and/or any Class Members are diagnosed.

## FACTS SPECIFIC TO PLAINTIFF DANIEL LESLIE

64.     Plaintiff Daniel Leslie has been a resident of Lake County since 1994.

65.     Due to Defendants' emissions of ethylene oxide from both the Waukegan Facility and the Gurnee Facility into the Lake County community, Plaintiff Leslie, like many other residents of Lake County, unknowingly lived with and inhaled carcinogenic ethylene oxide for years.

66.     As such, until recently, Plaintiff had no reason to believe he was being subjected to an increased risk of cancer.

67.     In fact, and regrettably, Plaintiff resides in a census track where the U.S. EPA has estimated a cancer risk of 70 cancer cases per million, which is 2.33 times higher than the national average cancer risk—a risk created solely by Defendants' conduct.

## CLASS ACTION ALLEGATIONS

68.     **Class Definition**: Plaintiff Daniel Leslie brings this action pursuant to Federal

Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All individuals who have resided within census tracts 17097862605, 17097862800, 17097861504, 17097862604, 17097863201, 17097862502, 17097862603, 17097862902, 17097862501, and 17097863100 for a period of one year or more since the Waukegan Facility or the Gurnee Facility began emitting ethylene oxide.

> Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

69. **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff at this time, but on information and belief, over 40,000 individuals fit within the definition of the Class according to 2010 census data. It is, therefore, clear that the members of the Class are so numerous that individual joinder is impracticable.

70. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Class and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to, the following:

    a.    Whether Defendants' conduct was negligent;

    b.    Whether Defendants owed a duty of care to Class Members;

    c.    Whether the duty of care owed to the Class included the duty to prevent their exposure to unsafe, unnecessary, and high levels of EtO emissions;

    d.      Whether Defendants breached their duty to the Class by exposing them to high levels of EtO and, thus, increasing their risk of contracting illnesses;

    e.      Whether medical monitoring and early diagnostic detection is reasonably necessary to protect the Class; and

    f.      Whether Plaintiff and Class Members are entitled to relief.

71.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class in that Plaintiff and the members of the Class sustained damages arising out of Defendants' uniform wrongful conduct.

72.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff also has no interests antagonistic to those of the Class and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to the Class.

73.    **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

74.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

75.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.     At all times relevant, Defendants owed a duty to Plaintiff and the Class to exercise reasonable care in the operation of their facilities, including the emission of EtO.

77.     Notwithstanding their duty, Defendants breached their duty in one or more of the following ways:

    a.     Emitting dangerous volumes of EtO into the air from its facilities;

    b.     Disregarding safe methods to adequately control EtO emissions from their facilities;

    c.     Failing to warn or advise those who live or work in the community that they were being exposed to EtO;

    d.     Failing to adequately record test results of high levels of EtO;

    e.     Ignoring test results of high levels of EtO;

    f.     Underreporting EtO levels; and

    g.     Subjecting those who live and work nearby their facilities to an elevated cancer risk.

78.     As a proximate result of Defendants' use and emission of EtO, Plaintiff and the Class have been subjected to an increased risk of cancer.

## COUNT II
**Willful and Wanton Conduct**
**(On Behalf of Plaintiff and the Class)**

79.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

80.     At all times relevant, Defendants owed a duty to Plaintiff and the Class to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or

conscious disregard to the health, safety, and well-being of Plaintiff and the Class—including individuals living and working in the area surrounding their facilities.

81.     Notwithstanding their duty, Defendants breached their duty in one or more of the following ways:

        a.      Emitting dangerous volumes of EtO into the air from its facilities;

        b.      Disregarding safe methods to adequately control EtO emissions from their facilities;

        c.      Failing to warn or advise those who live or work in the community that they were being exposed to EtO;

        d.      Failing to adequately record test results of high levels of EtO;

        e.      Ignoring test results of high levels of EtO;

        f.      Underreporting EtO levels; and

        g.      Subjecting those who live and work nearby their facilities to an elevated cancer risk.

82.     As a proximate result of Defendants' use and emission of EtO, Plaintiff and the Class have been subjected to an increased risk of cancer.

## COUNT III
### Public Nuisance
### (On Behalf of Plaintiff and the Class)

83.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

84.     Since at least 1994, Defendants knew EtO to be hazardous and harmful to humans.

85.     The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

86.     Defendants' use and emission of EtO from their facilities substantially and unreasonably infringed upon and/or transgressed this public right.

87.     Defendants knew that the levels of EtO gas emitted from their facilities would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of people living and working in the community.

88.     Defendants otherwise should have known that the levels of EtO gas emitted from their facilities would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons breathing it.

89.     Defendants' operation, maintenance, and use of its sterilizing facility caused those who live and work in the area surrounding its facility to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

90.     As a proximate result of Defendants' operation, maintenance, and use of their facilities, Plaintiff's and Class Members' right to breathe clean air free of dangerous levels of carcinogens such as EtO was infringed and/or severely diminished.

91.     As a proximate result of Defendants' operation, maintenance, and use of their facilities, EtO continuously invaded and contaminated the areas immediately surrounding Plaintiff's and the Class Members' residences.

92.     As a proximate result of Defendants' use and emission of EtO, Plaintiff and the Class were exposed to and inhaled great amounts of EtO.

93.     As a proximate result of Defendants' use and emission of EtO, Plaintiff and the Class have been subjected to an increased risk of cancer.

94.     As a proximate result of Plaintiff's and the Class's inhalation of EtO from Defendants' facilities, Plaintiff and the Class suffered injuries of a personal and pecuniary nature.

**COUNT IV**
**Ultrahazardous Activity/Strict Liability**
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.     Defendants' use and emission of EtO from the Waukegan Facility and the Gurnee Facility constitutes an ultrahazardous activity.

97.     Defendants' use and emission of EtO created a high degree of risk to Plaintiff and the Class—the likelihood of cancer caused by Defendants' use and emission of EtO is as much as five times the level of acceptable risk.

98.     Defendants' use and emission of EtO is especially unreasonable and abnormally dangerous given the densely populated residential and commercial area in which the facilities are located.

99.     The activities conducted by Defendants are exceedingly dangerous and offer little to no value to the surrounding community.

100.    Because the activities of Defendants are ultrahazardous, they are strictly liable for any injuries proximately resulting therefrom.

101.    As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiff and the Class were exposed to and inhaled great amounts of EtO.

102.     As a proximate result of Defendants' use and emission of EtO, Plaintiff and the Class have been subjected to an increased risk of cancer.

## COUNT V
### Medical Monitoring
### (On Behalf of Plaintiff and the Class)

103.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

104.     EtO is a dangerous toxicant that has been proven to cause cancer in humans.

105.     Defendants tortuously emitted EtO from their Lake County, IL, facilities in amounts that are far higher and more hazardous than the acceptable standard.

106.     Plaintiff and Class Members were significantly exposed to EtO due to Defendants' tortious actions.

107.     As a proximate result of their exposure to EtO, Plaintiff and Class Members have a significantly increased risk of developing several types of cancer and other illnesses, including but not limited to, blood cancers, breast cancers, tumors, and reproductive issues.

108.     This increased risk makes periodic diagnostic medical examinations reasonably necessary.

109.     Monitoring and diagnostic procedures exist that make early detection of these cancers possible and beneficial.

110.     These monitoring and diagnostic procedures are different than those normally recommended in the absence of exposure to toxic gas such as EtO and are reasonably necessary due to Plaintiff's and Class Members' significant exposure to EtO.

111.     As a result, Plaintiff and the Class should be awarded the costs of such a monitoring regime.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Daniel Leslie, individually and on behalf of the Class, requests

that the Court enter judgment in their favor and against Defendants as follows:

a. An Order certifying the Class as defined herein and appointing Plaintiff Leslie and his Counsel as representatives of the Class;

b. An award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

c. An Order creating a fund for a medical monitoring program in an amount determined to be just and reasonable;

d. An award of punitive damages as allowed by law and in an amount to be determined;

e. An award of attorneys' fees, costs and litigation expenses;

f. An award of prejudgment interest on all amounts awarded;

g. An Order for injunctive and declaratory relief; and

h. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**DANIEL LESLIE**

Date: March 6, 2020                    By: /s/ Benjamin H. Richman
                                            One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Iman Boundaoui
iboundaoui@edelson.com

23

Michael Ovca
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6370