**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DANIEL LESLIE, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

MEDLINE INDUSTRIES, INC., *et al.*,

Defendants.

No. 20-cv-01654
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

In a one-count negligence complaint, Daniel Leslie (Plaintiff), individually and

on behalf of all others similarly situated, alleges that Defendants Medline Industries,

Inc. (Medline), Isomedix Operations, Inc. (Isomedix), Cosmed Group, Inc. (Cosmed),

and Vantage Specialty Chemicals, Inc. (Vantage) (collectively, Defendants) emitted

toxic ethylene oxide (EtO), a carcinogen, into the community, thereby placing

individuals living and working in the vicinity of Defendants' medical sterilization and

chemical production facilities at an increased risk of cancer and other illnesses. R. 46,

First Amended Class Action Complaint (FAC) at 1.[1] Plaintiff seeks certification of a

medical monitoring class with relief in the form of a monetary fund to pay for

allegedly reasonably necessary testing that will lead to the early detection and

treatment of EtO-related cancers. *Id.* ¶¶ 77–80. Medline's motion to dismiss pursuant

to Federal Rule of Civil Procedure 12(b)(6) (R. 51, Medline Mot. Dismiss & Memo.);

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name,
and where necessary, a page or paragraph citation.

Isomedix's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) (R. 57, Isomedix Mot. Dismiss); Cosmed's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) (R. 50, Cosmed Mot. Dismiss); and Vantage's motion to dismiss pursuant to Rule 12(b)(6) (R. 54, Vantage Mot. Dismiss) are all before the Court. Defendants collectively argue that Plaintiff lacks Article III standing and has failed to allege the requisite elements of a negligence claim, namely that Plaintiff has failed to allege present bodily injury. *See e.g.*, Medline Mot. Dismiss & Memo. at 5–8. For the reasons that follow, Defendants' motions to dismiss are granted.

## Background

Defendants Medline, Isomedix, and Cosmed are commercial medical equipment sterilizers that sterilize medical devices and hospital equipment, and Vantage is a producer of chemical compounds used in household products. FAC ¶¶ 15–17.[2] Between approximately 1994 and 2005, Cosmed operated a medical sterilization facility in the City of Waukegan, located in Lake County, Illinois (the Waukegan Facility). *Id.* ¶ 17. Isomedix took over and operated the facility from 2005 to 2008. *Id.* In 2008, Medline took over and continues to operate the Waukegan Facility for medical device sterilization today. *Id.* Meanwhile, Vantage has operated and continues to operate a chemical production facility in the Village of Gurnee, also located in Lake County, Illinois (the Gurnee Facility), since 1985. *Id.*

Defendants use EtO in their industrial processes. FAC ¶ 17. EtO is a flammable gas at room temperature that is produced in large volumes and primarily

---

[2]The Court accepts as true all of the well-pleaded facts in the Complaint and draws all reasonable inferences in favor of Plaintiff. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

used for medical equipment sterilization and chemical production. *Id.* ¶ 14. Each time medical equipment undergoes the sterilization process, EtO is emitted—whether through controlled or uncontrolled emissions—into the atmosphere. *Id.* ¶ 15. For chemical production, EtO undergoes a chemical reaction to create new chemical compounds. *Id.* ¶ 16. Ethylene glycol is one of the most common chemicals synthesized from ethylene oxide and is used in a wide range of home products. *Id.* ¶ 16.

Isomedix and Cosmed emitted, and Medline and Vantage continue to emit, EtO into the air, allowing it to disburse and be carried by wind throughout the area surrounding the facilities. FAC ¶ 18. As such, Plaintiff, a Lake County resident, alleges that local residents and workers have been unknowingly subjected to and in fact breathed in EtO for decades. *Id.* ¶¶ 19, 62. He alleges that EtO is a dangerous, toxic, carcinogenic, mutagenic, and highly reactive substance that when taken up by the lungs, is absorbed into the blood stream and distributed throughout the body. *Id.* ¶ 20. Scientific studies published as early as 1977 have concluded that EtO can increase genetic mutations in humans. *Id.* ¶¶ 21–27. Plaintiff alleges that today, evidence links EtO exposure to increased risk of lymphohematopoietic cancer such as non-Hodgkin's lymphoma, multiple myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments including increased rate of miscarriages and infertility. *Id.* ¶¶ 21–27. Most recently, the Illinois Department of Public Health (IDPH) conducted an assessment of cancer rates in the population surrounding a medical

3

equipment sterilization facility in Willowbrook, Illinois that similarly uses and emits EtO into surrounding areas, and found elevated cases of several types of cancers. *Id.* ¶ 27.

With respect to Defendants' facilities in Lake County, the United States Environmental Protection Agency (EPA) released its 2014 National Air Toxics Assessment (NATA) on August 22, 2018. FAC ¶ 29. The NATA is a screening tool that estimates cancer risks based on emission data by census tract across the country. *Id.* NATA revealed 109 census tracts with cancer risk scores greater than what the EPA considers "acceptable" limits (100 cases for every one million people exposed to toxic air pollution during their lifetimes). *Id.* ¶ 30. Of those 109 census tracts, the EPA identified four in Lake County and released a statement noting that it believes the "largest sources of [EtO] emissions in Lake County" are the Waukegan Facility and the Gurnee Facility. *Id.* ¶ 31. The EPA further estimated that the lifetime risk of developing cancer due to air toxicity in one of the four tracts near the Waukegan and Gurnee Facilities to be up to five times higher than the average national cancer risk across the country's population. *Id.* ¶ 32. Plaintiff alleges that the risks identified by the NATA are likely understated, as the 2014 report did not even include Vantage's EtO emissions, and Medline's EtO emissions have been historically been higher than what was reported in 2014. *Id.* ¶¶ 35–37.

On May 20, 2019, the Village of Gurnee, City of Waukegan, and Lake County agreed to conduct air monitoring. FAC ¶ 50. Between June 2019 and April 2020, Lake County conducted three phases of air testing, with all test results showing the

presence of EtO. *Id.* ¶¶ 51–55. Lake County's final phase of air monitoring in April 2020 (after Medline had reportedly installed new air emission controls) registered EtO levels over 53 times the EPA's 100-in-a-million cancer risk in remote locations, EtO levels 43 times the EPA's 100-in-a-million cancer risk near the Waukegan Facility, and EtO levels over 274 times the EPA's 100-in-a-million cancer risk near the Gurnee Facility. *Id.* ¶ 54.

Plaintiff maintains that he was unknowingly subjected to and in fact breathed in carcinogenic EtO, all while Defendants knew, or should have known, that EtO is the cause of various illnesses, including a variety of cancers, miscarriages, birth defects, and other life-altering health effects. FAC ¶¶ 5–19. Based on this alleged harm, on March 6, 2020, Plaintiff brought a one-count negligence complaint against Defendants seeking certification of a medical monitoring class. R. 1, Compl. On June 24, 2020 and again on August 20, 2020, Defendants filed an unopposed motion for a 60-day continuance pending the Illinois Supreme Court's ruling in *Berry v. City of Chi.*, 2020 WL 5668974 (Ill. Sept. 24, 2020). R. 33, Mot. Stay; *see also* R. 37, Mot. Stay II. The parties anticipated that the Illinois Supreme Court's decision in *Berry*, a negligence class action in which the plaintiffs sought medical monitoring relief based on an increased risk of exposure to lead and lead poisoning, would affect the scope and viability of Plaintiff's claims in this case. Mot. Stay at 2. The Court[3] granted the parties' requests and stayed the proceedings pending the Illinois Supreme Court's

---

[3]At that time, this case was pending before Judge Lee. It was reassigned to this Court on September 28, 2020. *See* R. 42.

5

ruling in *Berry*. R. 35, Mot. Stay Order; *see also* R. 39, Mot. Stay Order II. On September 24, 2020, the Illinois Supreme Court issued its decision in *Berry*. 2020 WL 5668974, at *1. In light of the findings in *Berry*, Plaintiff requested leave of Court to file an amended complaint, which the Court granted. R. 44, Stip.; R. 45, Am. Compl. Order.

On November 14, 2020, Plaintiff filed the operative First Amended Complaint. *See* FAC.[4] Asserting one count of negligence, Plaintiff alleges that Defendants owed him and potential class members a duty to exercise reasonable care in the operation of their facilities, including in the emission of EtO. *Id.* ¶ 74. He claims that Defendants breached their duties by emitting dangerous volumes of EtO into the air; failing to warn or advise those who live or work in the community that they were being exposed to EtO; and subjecting those who live and work near Defendants' facilities to an elevated cancer risk. *Id.* ¶ 75. As a proximate cause of Defendants' use and emission of EtO, he claims that he and all potential class members have suffered harm in that they "inhaled air polluted with Defendants' EtO at levels drastically higher than normal." *Id.* ¶ 58. As a result of this harm, Plaintiff maintains that it is reasonably necessary for the putative class to undergo periodic diagnostic medical examinations to assure early diagnosis and effective treatment and to mitigate the risks of onset disease. *Id.* ¶ 59. Plaintiff requests that he and the putative class be awarded the costs of such a monitoring regime. *Id.* ¶ 80.

---

[4]Plaintiff alleges that the Court has diversity jurisdiction over this case, as at least one member of the Class is a citizen of a different state than Defendants, the amount in controversy exceeds $5,000,000, and none of the 28 U.S.C. § 1332(d)(2) exceptions apply. *Id.* ¶ 11.

Each Defendant moves to dismiss the FAC pursuant to either Rule 12(b)(6) only or both Rules 12(b)(1) and 12(b)(6). *See* Medline Mot. Dismiss & Memo.; R. 52, Cosmed Memo.; R. 55, Vantage Memo.; R. 58, Isomedix Memo. For the reasons that follow, the Court grants Defendants' motions to dismiss.

## Standards of Review

A Rule 12(b)(1) motion tests whether the court has subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Standing is an "essential component of Article III's case-or-controversy requirement," and the plaintiff "bears the burden of establishing standing . . . in the same way as any other matter on which the plaintiff bears the burden of proof . . . ." *Apex Digital, Inc. v. Sears Roebuck & Co.,* 572 F.3d 440, 443 (7th Cir. 2009). In order to survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing subject matter jurisdiction. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). When deciding a facial challenge to subject matter jurisdiction—that is, when the defendant argues that the plaintiff's *allegations* as to jurisdiction are inadequate—"the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). But district courts may also "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether *in fact* subject matter jurisdiction exists." *Taylor*, 875 F.3d at 853 (citing *Apex Digital*, 572 F.3d at 444). In that case, "no presumptive truthfulness attaches to plaintiff's

allegations," and the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Apex Digital*, 572 F.3d at 444 (internal citations omitted).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

As the primary basis for dismissal in all four motions, Defendants maintain that Plaintiff fails to allege a present physical injury. *See* Medline Mot. Dismiss & Memo. at 4–9; Cosmed Memo. at 5–8; Vantage Memo. at 5–9; Isomedix Memo. at 6–8. Cosmed and Isomedix have moved to dismiss on this ground under both Rules

12(b)(1) and 12(b)(6), whereas, Medline and Vantage have moved to dismiss on this same ground under Rule 12(b)(6) only.

Without an allegation of a concrete injury, Cosmed and Isomedix contend that Plaintiff lacks standing to bring suit, which warrants dismissal under Rule 12(b)(1). And relatedly, without an allegation of an injury, all Defendants argue that Plaintiff has failed to state a requisite element of his negligence claim, warranting dismissal under Rule 12(b)(6). Because the Court has an independent obligation to ensure it has subject matter jurisdiction over this action, and because all Defendants are advancing essentially the same arguments, the Court considers the four motions together. *See Olson v. Bemis Co.*, 800 F.3d 296, 300 (7th Cir. 2015) ("Although the parties did not brief the issue of jurisdiction, federal courts have an independent 'obligation at each stage of the proceedings to ensure that they have subject matter jurisdiction over the dispute.'") (internal citations omitted). In other words, the Court will be considering dismissal under both Rules 12(b)(1) and 12(b)(6) as to all Defendants. Further, in addition to the injury discussions, Defendants also alternatively argue for a Rule 12(b)(6) dismissal based on Plaintiff's failure to allege other requisite elements of negligence—duty, breach, and proximate cause.

The Court begins with the standing analysis, as it must, followed by Defendants' arguments concerning the sufficiency of Plaintiff's negligence allegations.

## I. Standing

Defendants argue that Plaintiff lacks standing to bring this suit. Cosmed Memo. at 5–7; Isomedix Memo. at 12–14. Article III standing, a matter of subject matter jurisdiction, consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The injury-in-fact inquiry "asks whether the plaintiff has suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151–52 (7th Cir. 2020) (internal citations and quotations omitted). A concrete injury "must actually exist" and must be "real and not abstract." *Spokeo, Inc.*, 136 S. Ct. at 1548.

Defendants argue that Plaintiff fails to allege the first Article III prong—a concrete injury or a substantial risk that harm will occur. *See, e.g.*, Cosmed Memo. at 5–7. Defendants contend that Plaintiff's "speculative 'fears of hypothetical future harm[s] that [are] not certainly impending' do not suffice for standing." Isomedix Memo. at 13 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)). Defendants insist that, at most, Plaintiff alleges that individuals living in the enumerated census tracts have a higher risk of cancer than those living in other census tracts. Cosmed Memo. at 6. However, Defendants assert that the mere potential risk of future injury does not confer standing. *Id.*

10

In response, Plaintiff argues that contrary to Defendants' assertion, he is not seeking redress for a speculative future injury. R. 61, Cosmed Resp. at 5. Indeed, Plaintiff contrasts his alleged harm to the "speculative" and "hypothetical" harms that have not constituted an injury-in-fact under Article III. *Id.* (citing *Clapper*, 568 U.S. at 410–11 (finding as "speculative" allegations that future conversations would be intercepted by the government insufficient to establish Article III standing); *Swanigan v. City of Chi.*, 881 F.3d 577, 583 (7th Cir. 2018) ("The injury [the plaintiff] forecasts—he says he *might* be pulled over, arrested, and again subjected to an unconstitutionally long detention—is layered with hypothetical and nowhere near certain."); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (noting that the concern in *Clapper* was that private communications might be intercepted, but standing only exists when the alleged harm "ha[s] *already* occurred") (emphasis in original)). Plaintiff insists that the harm here is neither speculative nor hypothetical, as years of "actually inhaling a toxic chemical compound" is a harm, albeit an "intangible" one, that has *already occurred*. R. 64, Isomedix Resp. at 14 (citing *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1064 (7th Cir. 2020) ("Both tangible and intangible harms can satisfy the concreteness requirement, although tangible injuries—e.g., physical harms and monetary losses—are 'easier to recognize.'")).

No party sufficiently develops a standing analysis. Instead, they cursorily quote general propositions of federal law and cite to cases that are far outside the contamination, bodily injury, or negligence contexts. *See* Cosmed Memo. at 5–7 (citing

*Clapper*, 568 U.S. at 402 and *Swanigan*, 881 F.3d at 583); Cosmed Resp. at 5–6 (citing *Larkin*, 982 F.3d at 1064; and *Fox, LLC*, 980 F.3d at 1152). Indeed, the Court finds that both sets of cases relied on by the parties are distinguishable and not particularly helpful here. For example, in *Clapper*, cited by both Cosmed and Isomedix, the Supreme Court found Article III standing lacking where the plaintiffs claimed that there was an "objectively reasonable likelihood that their [electronic] communications will be acquired [by the Government] under § 1881a [of the Foreign Intelligence Surveillance Act] at some point in the future." 568 U.S. at 407. The Supreme Court explained that the alleged injury was based on a "highly attenuated chain of possibilities" and so the threatened injury was not certainly impending. *Id.* at 410 (identifying five "highly speculative" fears of the plaintiffs including whether the government would even invoke its authority under the challenged law and whether Article III judges would find the government's procedures constitutional). In other words, the exposure to future harm had not occurred and may never have occurred, which is decidedly different from the alleged exposure here. Plaintiff's cited case, *Fox,* fares no better, as nothing in the *Fox* decision suggests that the "privacy injury" resulting from the unlawful retention of biometric data could or should be applied to the context of bodily exposure and risk of future disease. *Fox, LLC*, 980 F.3d at 1154–55. The Court is not prepared to make that leap (or the leaps suggested by the parties from the other cited electronic surveillance, data breach, or unfair debt collection cases).

12

But standing is an essential element of subject-matter jurisdiction, *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020), and the Court has an independent obligation to determine whether it has subject-matter jurisdiction. *Shelbourne N. Water St. Corp. v. Nat'l Asset Mgmt. Agency*, 375 F. Supp. 3d 712, 724 (N.D. Ill. 2019). To that end, the Court conducted its own research and identified several factually analogous cases that stand for the proposition that *for the purposes of Article III standing only*, the exposure to harmful contaminants is a sufficiently "concrete and particularized" injury to satisfy the first prong of the standing analysis. *See Walker v. City of E. Chi.*, 2017 WL 4340259, at *12 (N.D. Ind. Sept. 29, 2017) (finding that the plaintiffs' exposure to high levels of lead and arsenic at the site of a public housing complex was a sufficiently "concrete and particularized" injury to satisfy the first prong)[5]; *Rolan v. Atl. Richfield Co.*, 2017 WL 3191791, at *5 (N.D. Ind. July 26, 2017) ("The Plaintiffs need not allege that they have already been contaminated [by the refineries' releasing of lead and arsenic into the community] to have sufficiently alleged an injury. For purposes of standing, 'risk of contamination' is an 'actual and imminent' injury."); *Carlough v. Amchem Prods., Inc.*, 834 F. Supp. 1437, 1454 (E.D. Pa. 1993) (surveying federal case law dealing with exposure to a toxin as an Article III injury-in-fact and concluding that exposure to a toxic substance

---

[5]The Court notes that in *Walker*, the plaintiffs also alleged "the loss of enjoyment of their property," an additional injury from what is alleged in the instant case. 2017 WL 4340259, at *12. However, the court in *Walker* specifically found that both "the exposure to harmful contaminants" and "the loss of enjoyment of their property" were independent "'concrete and particularized' injuries to satisfy the first prong," on their own. *Id.*

like asbestos, "without more," "constitute[d] sufficient injury in fact to give a plaintiff standing to sue in federal court") (internal quotation marks omitted).

*Rolan* is especially analogous to the case at bar. In *Rolan*, the plaintiffs brought a proposed class action against a manufacturing and metal refining company and a pesticide production company, which were releasing lead and arsenic into an area that encompasses a public housing complex. 2017 WL 3191791, at *1. The plaintiffs alleged that the release of hazardous substances disrupted their lives, causing stress and discomfort; caused the plaintiffs to expend time and money to investigate the nature of the release and to arrange for alternative temporary housing; and particularly relevant here, "'threatened the health of Plaintiffs [and] their children' and 'expose[d] them to injury and the fear of injury, including increased cancer rate and irreversible health impacts.'" *Id.* at *3. Just as Defendants do here, the defendants in *Rolan* argued that the plaintiffs lacked standing, because the alleged injury, which the defendants characterized as the "fear of injury," was too speculative to satisfy the actual or imminent requirement. *Id.* at *5. The court disagreed, explaining that the plaintiffs "need not allege that they have already been contaminated to have sufficiently alleged an injury. For the purposes of standing, '*risk of contamination*' is an 'actual and imminent' injury." *Id.* (emphasis added). Notably, although the plaintiffs in *Rolan* alleged additional time and money expenses and an inability to enjoy their land, the court was clear that risk of contamination, on its own, constituted an injury-in-fact for purposes of Article III standing. *Id.*

14

The Court acknowledges, of course, that these cases are not binding, but the Court finds them persuasive and further finds that Plaintiff has alleged an injury-in-fact to satisfy the first standing prong here.[6]

Crucially, and as Plaintiff correctly notes, Article III standing and entitlement to relief are not the same thing. *See* Cosmed Resp. at 7 (citing *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008)). "Standing is a prerequisite to *filing suit,* while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is *entitled to relief.*" *Arreola*, 546 F.3d at 795 (emphasis in original); *see also Ariz. State Legislature v. Aris. Indep. Redistricting Comm'n,* 135 S.Ct. 2652, 2663 (2015) ("[O]ne must not confuse weakness on the merits with the absence of Article III standing.") (internal quotation omitted); *Vill. of Riverdale v. 138th St. Joint Venture*, 527 F. Supp. 2d 760, 765 (N.D. Ill. 2007) ("Defendants do not point to, nor has this Court found, any authority for the proposition that the

---

[6]Isomedix (alone) also challenges the second and third standing prongs—fairly traceable and redressability. *See* Isomedix Memo. at 14–15. The Court finds that Plaintiff has alleged an injury fairly traceable to Isomedix. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008) (noting that for causation, there must be a fairly traceable connection between the alleged injury and the defendant's alleged conduct) (internal citations omitted). Per the FAC, Isomedix emitted over 13,000 pounds of EtO into the atmosphere during its years operating the Waukegan Facility. ¶¶ 44–45. And, the Court finds that, at least for purposes of standing, Plaintiff has alleged that his injury is redressable through a medical monitoring regime. *Id.* ¶ 62 ("Having been harmed by regularly breathing in Defendants' elevated levels of EtO, Plaintiff and Class Members seek as damages the costs of such diagnostic testing and medical monitoring, in order to detect the early onset of disease. This testing will, in turn, identify the need for treatment, management, and rehabilitation in the event cancer is detected and Plaintiff and/or any Class Members are diagnosed."); *see also Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 575 (6th Cir. 2005) ("Assuming Sutton is capable of proving the device puts implantees at a substantially greater risk for developing restenosis and occlusion of the bypass graft—as he asserts in his complaint—medical monitoring will undoubtedly help to remedy the situation.").

15

requirements for establishing a claim are necessarily blended with the requirements of establishing standing such that an increase in the former necessitates an increase in the latter. Thus, Defendants' argument, that because [Plaintiff] has not pleaded enough facts in its complaint based upon the holding of *Twombly* to support the third element of its [Resource Conservation and Recovery Act] claim, it cannot show an actual injury-in-fact sufficient to establish Article III standing, is without merit."). Moreover, standing is a "corollary of Article III's limitation of the 'judicial power' to the resolution of 'cases' and 'controversies.'" *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 730–31 (7th Cir. 2020), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chi., Illinois*, 2021 WL 1602736 (U.S. Apr. 26, 2021) (citing U.S. CONST. art. III, § 2, cl. 1 (capitalization omitted)). "The [standing] requirement limits the power of *federal* courts and is a matter of *federal* law. It does not turn on state law, which obviously cannot alter the scope of the federal judicial power." *Id.* (emphasis in original). Meaning, to what extent an injury is legally cognizable under the laws of state jurisdictions is a separate inquiry. *Carlough*, 834 F. Supp. at 1448 (internal quotation omitted). In other words, the Court must separate its analyses regarding Article III injury-in-fact, on the one hand, and the cognizable injury element under Illinois law for the basis of a negligence claim, on the other.

*Carlough* is illustrative of this distinction. 834 F. Supp. at 1447. In that case, the Eastern District of Pennsylvania found that the "exposure-only plaintiffs" (the plaintiffs that had been occupationally exposed to asbestos but who did not manifest any asbestos-related conditions) had Article III standing under the injury-in-fact test

(distinct from the former "legal interest" test) despite arguments about their inability to sustain a cause of action under generally applicable principles of Pennsylvania tort law. *Id.* at 1450 ("Also, if a plaintiff had to show a valid cause of action to confer Article III jurisdiction, federal courts could never entertain diversity cases where the existence of the asserted claim under state law was unclear. This is so because standing to sue must clearly exist before a federal court is permitted to reach the merits of a case. Of course, federal courts are often called upon to decide unsettled issues of state law. . . . Therefore, I conclude that the applicable legal precedent requires that the question of whether the exposure-only plaintiffs have standing to bring this lawsuit in federal court does not depend on whether they have stated a valid cause of action under applicable tort law.") (internal citations omitted).

The same is true here—any lack of a cause of action under applicable Illinois tort law does not mandate a finding of no injury-in-fact for purposes of Article III standing. The Court could dismiss this case for failure to state a claim after concluding that it has subject matter jurisdiction. *Carlough*, 834 F. Supp. at 1449; *see also Rolan*, 2017 WL 3191791, at *5 ("Even if the Plaintiffs' allegations do not survive the Defendants' Rule 12(b)(6) Motion, they satisfy the standing requirements of Article III of the Constitution because they sufficiently plead a 'case or controversy.'").

Based on the above-mentioned Article III exposure cases, the Court finds that Plaintiff has sufficiently alleged an injury-in-fact for purposes of standing. But for the reasons that follow, Plaintiff has not alleged a cognizable injury under Illinois law for purposes of stating a claim.

## II.    Failure to State a Claim

Turning to the merits, Plaintiff's one-count complaint alleges that Defendants negligently emitted toxic EtO into the community, thereby placing individuals living and working in the vicinity of Defendants' medical sterilization and chemical production facilities at an increased risk of cancer and other illnesses. FAC ¶¶ 18, 54. To state a cause of action for negligence under Illinois law, a plaintiff must allege: 1) the existence of a duty of care owed by the defendant to the plaintiff; 2) a breach of that duty of care; and 3) an injury proximately caused by that breach. *Monson v. City of Danville*, 115 N.E.2d 81, 95 (Ill. 2018). It is undisputed that Illinois law requires a "legally cognizable present injury or damage to sustain a negligence claim." *Yu v. Int'l Bus. Machs. Corp.,* 732 N.E.2d 1173, 1177 (Ill. App. Ct. 2000).

Defendants posit that even if Plaintiff has standing to bring suit in federal court, Plaintiff has failed to assert a negligence claim under Illinois law, because he has not alleged a cognizable, present injury. Cosmed Memo. at 1. Defendants contend that the Illinois Supreme Court foreclosed Plaintiff's claim in the recently-decided *Berry* by reaffirming the principle that "in a negligence action, an increased risk of harm is not an injury." Medline Mot. Dismiss & Memo. at 6 (quoting *Berry*, 2020 WL 5668974, at *7). Defendants explain that Plaintiff's allegations, at most, amount to the following: Plaintiff and the putative class members "suffered harm in that they inhaled air polluted with Defendants' EtO at levels drastically higher than normal," and "[t]his exposure makes it significantly more likely that [they] will develop future illnesses, including several types of cancer and other illnesses, including but not

18

limited to, blood cancers, breast cancers, tumors, and reproductive issues. which makes periodic diagnostic medical examinations reasonably necessary." *Id.* at 7; *see also* FAC ¶¶ 58, 77. Defendants insist that these allegations mirror those in *Berry*, where the plaintiffs sought medical monitoring based on the potential for *future harm* caused by drinking lead-contaminated water. Medline Mot. Dismiss & Memo. at 5 (citing *Berry*, 2020 WL 5668974, at *7).

Not surprisingly, Plaintiff has a different take on *Berry* and its ramifications for his negligence claim. Medline Resp. at 5–9. He maintains that he alleges a past physical injury in the form of inhaling a toxic chemical compound, which constitutes a concrete injury-in-fact, and the Illinois Supreme Court in *Berry*, "charted a path forward for cases like this one, where plaintiffs assert that a defendant . . . acted in the same way to negligently poison a putative class with a pollutant . . . that the defendant emitted from its facilities." *Id.* at 5. Plaintiff insists that "[i]n those instances, and according to *Berry*, medical monitoring relief for a plaintiff and putative class is available and appropriate." *Id.*

Before examining *Berry* further, the Court finds it instructive to provide some historical context of the increased risk of future harm/present injury negligence landscape pre-*Berry*. In 2002, the Illinois Supreme Court decided *Dillon v. Evanston Hosp.*, 771 N.E.2d 357 (Ill. 2002). In that case, during the course of a surgery to remove a catheter, the defendant-surgeon inadvertently left a catheter fragment in the plaintiff-patient's chest. *Id.* at 361. A year later, a routine chest x-ray revealed that the catheter fragment had migrated to the plaintiff's heart. *Id.* The plaintiff met

with the defendant-surgeon, and he advised that the risk of injury from an attempted removal of the catheter outweighed the potential risks that would exist if the catheter remained in the heart (i.e., infection, perforation of the heart, arrhythmia, embolization, and further migration). *Id.* Based on the medical opinions she received, including the defendant-surgeon's, the plaintiff decided to leave the catheter in place. *Id.* The plaintiff then filed a medical malpractice suit against the surgeon and the hospital. *Dillon*, 771 N.E.2d at 361. At the time of the trial, the plaintiff had not suffered any of the at-risk conditions. *Id.* at 366. A jury awarded the plaintiff damages for her "increased risk of future injuries." *Id.* at 361–62. The Illinois Supreme Court affirmed the verdict and in doing so, joined the trend from other jurisdictions of allowing compensation for increased risk of future injuries where the defendant's wrongdoing created the risk. *Id.* at 366–70. Underpinning the court's rationale was that all damages, future and past, must be presented and considered at the time of trial, and that "[a]n entire claim arising from a single tort cannot be divided and be the subject of several actions." *Id.* at 369. The court held that for a plaintiff to recover *damages* for increased risk of future harm in a tort action, the plaintiff must establish that the defendant's breach of duty caused a present injury that resulted in the increase risk of future harm. *Id.* at 371–72 (emphasis added).

The Illinois Supreme Court next addressed the issue of increased risk of future harm in *Williams v. Manchester*, 888 N.E.2d 1 (Ill. 2008). In *Williams*, the plaintiff-patient was involved in a car accident while pregnant. *Id.* at 3. The plaintiff's fetus was not injured in the accident, but the plaintiff suffered a broken hip and pelvis. *Id.*

20

The plaintiff was advised that the pelvic surgery necessary to treat her injuries would likely put the fetus at risk for loss, but delaying the surgery would put the plaintiff at risk of permanent injury. *Id.* at 4. The doctors also informed the plaintiff that the radiation exposure from the X-rays that had already been taken in the emergency room could cause a future risk of deformities to the fetus. *Id.* at 4–6. Based on the doctors' medical opinions, the plaintiff terminated the pregnancy and underwent pelvic surgery. *Id.* at 6. Thereafter, the plaintiff filed a wrongful death suit. *Id.* One important question before the Illinois Supreme Court was whether the fetus' risk of future harm caused by radiation exposure was a "present injury" for which the fetus could have brought an action for damages had the fetus survived the accident. *Id.* at 13. Reiterating the principle that "as a matter of law, an increased risk of harm is an element of damages that can be recovered for a present injury—it is *not* the injury itself," the court found that risk of future harm caused by radiation exposure was not a present injury. *Id.* Importantly, the court distinguished *Dillon*, explaining that the issue in *Dillon* was the "availability and computation of *damages* for the increased risk of future harm from the plaintiff's present injury." *Id.* at 13–14 (emphasis added). The court was clear that the issue in *Williams* was not the scope of damages, but rather who may sue and under what conditions. *Id.* at 14 (internal citations omitted). The court posited that even if it were to "convert or expand" *Dillon* so as to describe an increased risk of future harm as a present injury, the plaintiff had not presented

any evidence that the fetus was injured as a result of the increased risk. *Id.* The court, therefore, affirmed summary judgment for the defendants. *Id.*

This brings us to *Berry*, the Illinois Supreme Court's most recent pronouncement on risk of future harm regarding a negligence claim. 2020 WL 5668974, at *5. The *Berry* plaintiffs filed a class action lawsuit against the City of Chicago, alleging that the City's remediation of lead pipes in its water system created an increased risk that lead would be dislodged or leach from residents' individual service lines into drinking water. *Id.* From this, the plaintiffs claimed that all members of the proposed class were subjected to "an increased risk of exposure," i.e., an increased risk of "having lead enter their bodies and of suffering lead poisoning." *Id.* at *5–6. Indeed, the plaintiffs alleged that the City took multiple samples of the water at the named plaintiffs' homes; testing at named plaintiff Berry's home revealed lead levels of up to 30.8 parts per billion (ppb), which was significantly higher than the EPA's recommended lead "action level" of 15 ppb, and testing at named plaintiff Peysin's home revealed lead levels that were "significant." *Id.* at *2. The plaintiffs filed suit, asserting a negligence claim and seeking to recover the costs of blood testing and other medical monitoring necessary to detect the presence of lead. *Id.* at *3, 6. The Illinois Supreme Court affirmed the circuit court's dismissal of the plaintiffs' complaint, finding that the plaintiffs had "allege[d] only that the City caused an increased risk of harm and, therefore, [did] not allege a cognizable injury for purposes of a negligence action." *Id.* at *7. The court explained that a plaintiff who suffers a bodily injury caused by a negligent defendant may recover for an increased

risk of future harm of the defendant's creation as an element of *damages* (as was the holding in *Dillon*), but an increased risk of developing lead poisoning alone was not an actionable injury as part of a negligence claim for purposes of tort law. *Id.* ("A person may pursue a cause of action in tort once harm occurs. Given this fact, there is little justification for imposing civil liability on one who only creates a *risk* of harm to others.") (emphasis in original).[7] The court also firmly rejected the plaintiffs' contention that the need for medical testing was an injury in itself. *Id.* The court observed that the plaintiffs' allegation that they required diagnostic medical testing was "simply another way of saying they have been subjected to an increased risk of harm," and "in a negligence action, an increased risk of harm is not an injury." *Id.*

It is against this backdrop that the Court must evaluate Plaintiff's allegations. Defendants insist that *Berry* is dispositive of whether Plaintiff has alleged an injury. *See* Medline Mot. Dismiss & Memo. The Court agrees. In the instant case, as in *Berry*, Plaintiff has not alleged a present physical injury flowing from exposure to EtO. Instead, Plaintiff has only alleged that he and other class members were "regularly exposed to and inhaled Defendants' high concentrations of carcinogenic EtO," and such exposure puts them a higher "*risk* [of] suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects." FAC ¶ 5 (emphasis added). That may be, but it is not the law in Illinois. *Berry* is clear—in a negligence

---

[7]The Illinois Supreme Court in *Berry* also discussed the practical justifications for requiring a showing or actual or realized harm before permitting recovery in tort. *Id.* at *7. It explained that "such a requirement establishes a workable standard for judges and juries who must determine liability, protects court dockets from becoming clogged with comparatively unimportant or trivial claims, and reduces the threat of unlimited and unpredictable liability." *Id.*

action, a plaintiff must allege a present physical injury, especially to recover damages for future harm connected to that injury. Plaintiff fails to do so here.

Plaintiff maintains that the *Berry* holding is distinguishable for three reasons, and that the holding actually allows for the medical monitoring remedy he seeks. *See* Medline Resp. at 5. First, he points to the opening paragraph of the *Berry* analysis, which served to "clarify the nature of the allegations contained . . . in the negligence claim." *Id.* at 5–6 (citing 2020 WL 5668974, at *5). In that paragraph, the court explained that the plaintiffs did not allege that every City resident who was a member of the proposed class, in fact, had elevated levels of lead in his or her water supply; that every class member had consumed contaminated water; or that it could ever be shown that elevated lead levels existed on a class-wide basis. *Id.* Based on this clarification, Plaintiff characterizes the *Berry* court as being "unwilling to allow everyone connected to a City of Chicago water source to sue the City for the hypothetical possibility that, in the future, they might be exposed to lead from their own pipes." *Id.* at 6. The Court finds that Plaintiff takes this framing paragraph too far and misconstrues the *Berry* holding. It is true that the *Berry* complaint did not allege that *all* putative class members had in fact ingested water contaminated with lead, but class certification was not at issue in *Berry*; rather, the court decided *Berry* on a motion to dismiss on an individual basis for the two named plaintiffs, and those named plaintiffs alleged *actually* elevated levels of lead in their water supplies. 2020 WL 5668974, at *2. The court found that the named plaintiffs had not alleged actual or realized harm despite their allegations of "significant" and "serious" levels of lead

24

in their water supplies, because the increased risk of developing lead poisoning alone was not an actionable injury. *Id.* at *7.

Second, Plaintiff insists that in *Berry*, there were no allegations that the City's negligence actually contaminated the water with lead. Medline Resp. at 6. By contrast, in this case, he alleges that Defendants negligently contaminated the air from the Gurnee and Waukegan Facilities, and the EtO contaminant reached Plaintiff and the putative class members' nearby properties. FAC ¶ 18. Again, this argument fails, as the named plaintiffs in *Berry did* allege that the City had replaced the water mains outside their homes, and testing thereafter revealed elevated levels of lead in their water supplies. *Berry*, 2020 WL 5668974, at *2.

Third, and the crux of his response, Plaintiff insists that there is an important distinction between the "increased risk of exposure" in *Berry* and the "actual exposure" here. *See* Medline Resp. at 6. Plaintiff contends that in *Berry*, the plaintiffs alleged only "an increased risk that lead will enter their bodies" and an "increased risk of exposure" (*Berry*, 2020 WL 5668974, at *5); whereas here, Plaintiff "alleges that he and the putative class have *already ingested* elevated and excessively dangerous amounts of Medline's EtO for a decade." Medline Resp. at 6 (citing FAC ¶¶ 55, 58, 63). He contends that this is not a case of future harm; the harm has already occurred. The Court finds this distinction unpersuasive and not reflected in the *Berry* analysis. *Id.* As Defendants counter in their reply briefs, *Berry* indeed recognized that the named plaintiffs alleged "actual exposure" to lead in their drinking water. *See* Medline Reply at 5 (quoting FAC ¶ 12 ("[A] routine checkup

25

revealed that Berry's two-year-old granddaughter had heightened levels of lead in her blood" and testing "results showed that the water contained 17.2 parts per billion (ppb) of lead, which is higher than the [EPA's] recommended lead 'action level' of 15 ppb.")). The *Berry* decision (and the *Williams* decision for that matter) rested not on this actual exposure to lead but on whether it was alleged that any such exposure caused actual physical injury, namely lead poisoning. *Berry*, 2020 WL 5668974, at *7; *see also Williams*, 888 N.E.2d at 4 (the plaintiff clearly alleged the fetus's actual exposure to x-ray radiation but had not alleged any birth defects resulting from that exposure). The court found that it was not. *Berry*, 2020 WL 5668974, at *7. At bottom, the FAC is premised on Plaintiff's exposure to dangerous levels of EtO. Without a corresponding present injury, that exposure is not enough under Illinois law. Put another way, the plaintiffs in *Berry* sought medical monitoring relief, so that they could diagnose lead poisoning; here too, Plaintiff seeks medical monitoring, so that the class can "detect the early onset of disease." FAC ¶ 61. Just as in *Berry*, the Court finds that "diagnostic medical testing" or "early detection testing" are just other ways of saying the plaintiffs have been subjected to an increased risk of harm only, and an increased risk of harm is not a present injury. *Berry*, 2020 WL 5668974, at *7. Importantly, nothing in this Opinion is meant to suggest that Plaintiff's exposure to a known carcinogen does not create an elevated risk of developing future illness. The Court takes Plaintiff's allegations (*see, e.g.*, FAC ¶ 65) as true at this stage. However,

it is clear that a higher than average cancer risk, without physical injury, is not actionable under *Berry*.

The Court is also unpersuaded by Plaintiff's additional cited cases which found the medical monitoring claims sufficient—*Letart v. Union Carbide Corp.*, 461 F. Supp. 3d 391, 397 (S.D. W. Va. 2020) and *Stella v. LVMH Perfumes & Cosmetics USA, Inc.*, 564 F. Supp. 2d 833, 835–36 (N.D. Ill. 2008). *See* Medline Resp. at 8. The Court agrees with Defendants that these cases are distinguishable. *See* Medline Reply at 7–8. In *Letart*, the district court held that a plaintiff who did not allege bodily harm had still adequately alleged a negligence claim under West Virginia law for medical monitoring against an EtO manufacturer. *Letart*, 461 F. Supp. 3d at 397. The court noted, however, that it "remain[ed] skeptical of the injury element of a medical monitoring cause of action," but, critically, it found that West Virginia law did not require a plaintiff seeking medical monitoring to allege a "present physical harm." *Id.* (quoting *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 431 (1999)). Defendants point out that in *Berry*, amici for the plaintiffs urged the Illinois Supreme Court to adopt West Virginia's *Bower* standard—the very precedent the *Letart* court was bound to apply. *Berry v. City of Chicago*, No. 124999, Public Justice Amicus Br., 2019 WL 7421780, *8. But the Illinois Supreme Court declined to do so.

In *Stella*, a court in this District did permit a medical monitoring damages claim under the Illinois Consumer Fraud Act in connection with the plaintiff's use of lipstick contaminated with lead. 564 F. Supp. 2d at 835–36. Crucially however, the court's decision in *Stella* was pre-*Berry* and its holding expressly stated that it was

made "in the absence of guidance from the Illinois Supreme Court on the propriety of medical monitoring claims under Illinois law." *See* R. 68, Cosmed Reply (citing *Stella*, 564 F. Supp. 2d at 836). The Illinois Supreme Court has now provided guidance in *Berry* for medical monitoring in the context of a negligence claim.

In sum, the Court finds that *Berry* controls and actual exposure absent any present physical harm is not enough. Plaintiff has failed to allege an injury for purposes of a negligence claim under Illinois law. Plaintiff has therefore failed to allege one of the requisite elements of negligence, and his claim fails.[8] The Court accordingly grants Defendants' motions for failure to state a claim and dismisses the FAC.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss [50, 51, 54, 57], and dismisses the FAC without prejudice. Plaintiff has until 10/21/2021 to file an amended complaint consistent with this Opinion. If no amended complaint is filed by that date, the dismissal will automatically convert to one with prejudice.

Dated: September 30, 2021

United States District Judge
Franklin U. Valderrama

---

[8]Reaching this determination requires dismissal of the negligence claim, and the Court accordingly need not address the parties' positions regarding the *Moorman* doctrine and economic loss or any additional elements of the negligence claim—namely, duty of care, breach, and proximate cause. *See Claire Assocs. by Livaditis v. Pontikes*, 502 N.E.2d 1186, 1191 (Ill. App. Ct. 1986) (To survive a motion to dismiss, a plaintiff must "merely allege sufficient facts to state *all* the elements which are necessary to constitute his cause of action . . . .") (emphasis added).